Slip Op. 13-127

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHANGZHOU WUJIN FINE CHEMICAL FACTORY CO., LTD., and JIANGSU JIANGHAI CHEMICAL GROUP, LTD., | |
| Plaintiffs, | Before: Judith M. Barzilay, Senior Judge |
| v. | Consol. Court No. 09-00216 |
| UNITED STATES, | **Public Version** |
| Defendant, and | |
| COMPASS CHEMICAL INTERNATIONAL, LLC, | |
| Defendant-Intervenor. | |

## OPINION

[Commerce's Remand Redetermination is sustained.]

October 2, 2013

*Riggle & Craven* (*David J. Craven*), for Plaintiffs.

*Stuart F. Delery*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Antonia R. Soares*); *Whitney Rolig*, Attorney-International, Of Counsel, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

*Levin Trade Law, P.C.* (*Jeffrey S. Levin*), for Defendant-Intervenor.

BARZILAY, Senior Judge:  This case returns to the court following a remand to the U.S. Department of Commerce ("Commerce") for further proceedings in accordance with the Federal


Case 1:09-cv-00216-JMB   Document 106   Filed 10/21/13   Page 2 of 15

Consol. Court No. 09-00216                                                                                      Page 2

Circuit's decision in *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ("*Changzhou*").[1] The Federal Circuit instructed Commerce to reconsider its approach in calculating the separate rate assigned to Plaintiff Jiangsu Jianghai Chemical Group, Ltd. ("Jiangsu").[2] On remand, Commerce changed its approach by abandoning the simple average methodology from the investigation[3] and adopting a different methodology that relied on inferences about Kewei's (an uncooperative respondent) actual dumping margin to conclude that Jiangsu's rate would have been above *de minimis*. *See Final Results of Redetermination Pursuant to Court Order*, Docket Entry No. 81 (May 13, 2013) ("*Remand Redetermination*"). Commerce, however, did not calculate a specific rate for Jiangsu because it concluded that doing so would have been an unnecessary expenditure of administrative resources given that the entries covered by the underlying investigation have already been liquidated. Jiangsu claims that the *Remand Redetermination* does not comply with the Federal Circuit's remand instructions. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). For the reasons set forth below, Commerce's *Remand Redetermination* is sustained.

### I. STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains

---

[1] Familiarity with the administrative and procedural history of this case is presumed. *See 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed.Reg. 10,545 (Dep't Commerce Mar. 11, 2009); *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, No. 09-00216, 2010 WL 3239213 (CIT Aug. 5, 2010); *Changzhou*, 701 F.3d 1367.

[2] Changzhou Wujin Fine Chemical Factory Co. ("Changzhou") did not participate in the appeal.

[3] In the investigation there were two mandatory respondents, Changzhou Kewei Fine Chemical Factory ("Kewei") and Nanjing University of Chemical Technology Changzhou Wujin Water Quality Stabilizer Factory Ltd. ("Wujin Water"). The separate rate respondents were Jiangsu and Changzhou.

Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is "reasonable and supported by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotations and citation omitted). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. DISCUSSION

In calculating a separate rate for non-individually investigated respondents in non-market economy investigations, Commerce normally relies on 19 U.S.C. § 1673d(c)(5), which defines the all-others rate used in market economy investigations. *See Bristol Metals L.P. v. United States*, 34 CIT __, __, 703 F.Supp.2d 1370, 1378 (2010) (citation omitted). The statute

instructs Commerce to weight-average the rates calculated for the investigated parties, excluding *de minimis* or zero rates and excluding rates based on facts available, to determine the separate rate. 19 U.S.C. § 1673d(c)(5)(A).  However, "[i]f the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or *de minimis* margins, or are determined entirely [on the basis of facts available], the administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." § 1673d(c)(5)(B).  The Statement of Administrative Action provides that the "expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.  It goes on to state that "if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods." *Id.*

In this case, Commerce originally calculated the separate rate by taking a simple average of the rates assigned to the two mandatory respondents.  One mandatory respondent (Wujin Water) received a *de minimis* rate (0%) and the other mandatory respondent (Kewei) failed to cooperate and received a rate based on total adverse facts available (72.42%).  This yielded a separate rate of 36.21%, which Commerce assigned to the separate rate respondents (Jiangsu and Changzhou).  They appealed Commerce's separate rate determination to this court.  During the course of the litigation, Commerce took a voluntary remand to address (among other things)

whether its original AFA rate had been corroborated. Commerce concluded that the 72.42% AFA rate had not been corroborated and elected to calculate a second AFA rate of 30.94% using data that did not require corroboration. Importantly, Commerce calculated the second AFA rate for the sole purpose of establishing a new separate rate for Jiangsu and Changzhou. Commerce, therefore, did not calculate the second AFA rate to replace the original rate assigned to Kewei. Kewei did not challenge the 72.42% AFA rate that it received. Commerce then applied the same methodology, taking the simple average of the 0% *de minimis* rate and the 30.94% substitute AFA rate, to arrive at a new separate rate of 15.47%. Although this court sustained Commerce's separate rate calculation, Jiangsu appealed that decision, and the Federal Circuit reversed and, as previously stated, remanded the issue to Commerce.

The Federal Circuit concluded that Commerce's separate rate calculation was arbitrary. It stated that "while administrative convenience might support averaging previously-determined, previously corroborated rates assigned to mandatory respondents, including AFA respondents if there are no alternatives, *see* 19 U.S.C. § 1673d(c)(5)(B), such a justification can hardly support Commerce's choice to calculate a hypothetical 'AFA rate' for use solely as a 'substitute' rate that will not be assigned to any mandatory respondent." *Changzou*, 701 F.3d at 1379. The Federal Circuit concluded that it was unreasonable to derive a separate rate, which would be applied only to (cooperative) separate rate respondents, from data that was "cherry picked" to deter non-compliance. *Id*. The Federal Circuit provided the following remand instructions:

> For the foregoing reasons, we . . . reverse in part, and remand to Commerce to once again reconsider its approach to calculating the appellant's separate rate. In doing so, Commerce must act non-arbitrarily and must explain why its approach is a "reasonable method" of calculating a separate rate, in light of the alternatives available, and with recognition of the fact that the remand calculation will affect only cooperating respondents.

*Id*.

On remand, Commerce provided the following explanation:

> In accordance with the CAFC's decision and the instructions in the remand order, the Department reconsidered its approach to calculating the separate rate assigned to Jiangsu Jianghai in the First Remand Results. After reexamining the dumping margins of the exporters/producers that were individually investigated, the Department finds that: (1) one mandatory respondent (*i.e.*, Nanjing University of Chemical Technology Changzhou Wujin Water Quality Stabilizer Factory Ltd. had a zero percent dumping margin during the period of investigation ("POI"), and (2) the other mandatory respondent (*i.e.*, Changzhou Kewei Fine Chemical Co., Ltd. was assigned a dumping margin based entirely on adverse facts available, but it may be reasonably inferred from its failure to cooperate that Kewei's own information would not have shown that Kewei's actual margin of dumping was zero or *de minimis*. Accordingly, even in the absence of considering deterrence of non-cooperation as a factor in determining Kewei's dumping margin, the Department reasonably infers that Kewei's own information, withheld from the Department, would have shown that a dumping margin greater than *de minimis* exists for Kewei during the POI.
> 
> On the basis of this reasonable inference, the Department determines that had Kewei cooperated by providing its information, the dumping margins of the individually investigated respondents would not have been all zero, *de minimis*, or based entirely on AFA. Therefore, the Department determines that a reasonable method of establishing Jiangsu Jianghai's separate rate for the POI is to apply the separate rate calculation methodology preferred in the statute, as provided in section 735(c)(5)(A) of the Tariff Act of 1930, as amended, with the reasonable inference that Kewei's dumping margin is above *de minimis* for this purpose. As a result, the Department concludes that Jiangsu Jianghai's separate rate for the POI was above *de minimis*. Further, given that any separate rate above *de minimis* would not apply to any entries of Jiangsu Jianghai's 1-hydroxyethylidene-1, 1-diphosphonic acid ("HEDP"), it would be an unnecessary waste of administrative and judicial resources to proceed with the additional resource-intensive calculations needed to further specify Jiangsu Jianghai's separate rate.
> 
> . . . .
> 
> Further, for the two reasons below, the Department disagrees with Jiangsu Jianghai's claim that the record evidence in this case compels a finding that Kewei's actual dumping margin for the POI was zero percent. First, Jiangsu Jianghai's observation that Kewei's rate would be zero percent if it were calculated using the sales and production information on the record is misleading because Kewei's lack of cooperation left the record void of the company-specific data necessary to calculate Kewei's actual dumping margin. Because it does not have Kewei's actual, verified sales and production data for the POI, Jiangsu Jianghai must rely on data belonging to companies other than Kewei (*e.g.*, Wujin Water's weighted-average NV) and Kewei's unverified quantity and value information in order to support its claim that Kewei's margin would have been zero percent during the POI. Jiangsu Jianghai fails to explain why either Kewei's unverified quantity and value data or data belonging to companies other than

>Kewei are in any way indicative of Kewei's actual sales and production data for the POI, particularly given the reasonable inference that Kewei made a rational decision not to submit its own sales and production data because a margin calculation based on this information would not produce a zero or *de minimis* rate. Second, Jiangsu Jianghai has identified no evidence that would dissuade the Department from reasonably inferring that Kewei made a rational decision, based on its knowledge of its own sales and production data during the POI, that it was not capable of obtaining a zero percent or *de minimis* rate. As explained above, the CAFC has confirmed that the Department may reasonably presume that a respondent will make a knowing and rational decision whether to respond to the Department's questionnaires, based on which choice will result in the lower rate. Jiangsu Jianghai provides no evidence that effectively rebuts this presumption or supports its speculation that Kewei stopped participating in the investigation because it either misjudged the surrogate values that would be applied or underestimated the value of participating. Indeed, even if Kewei had stated that it believed it was entitled to a zero percent or *de minimis* rate despite its withdrawal from the proceeding, such a statement is not a basis upon which the Department could make findings about Kewei's actual dumping margin, and Kewei's failure to respond to the Department's questionnaires at all does not undermine the Department's reasonable inference that the most important factor in that decision was Kewei's knowledge of its sales and production data. Furthermore, even if the timing of Kewei's withdrawal were relevant, the record does not support Jiangsu Jianghai's suggestion that the withdrawal was contingent on Kewei's predictions regarding the selection of the surrogate country and surrogate values because Kewei stopped participating prior to a June 20, 2008 questionnaire response deadline- *i.e.*, before July 1, 2008, when comments on surrogate country selection and surrogate value submissions were originally due and when Kewei would have had a clearer picture regarding surrogate country selection and surrogate values.

*Remand Results* at 2, 20-21.

Accordingly, Commerce has outlined a different approach for calculating a separate rate for Jiangsu. Commerce has drawn an inference that Kewei would have received an above *de minimis*[4] dumping margin had it participated in the investigation. Commerce claims that drawing such an inference is reasonable because Kewei's lack of participation suggests that it was dumping merchandise and therefore would have been assigned a dumping margin greater than *de minimis*. *See Remand Results* at 6 (citing *Laminated Woven Sacks From the People's Republic of China: Final Results of First Antidumping Duty Administrative Review*, 76 Fed. Reg.

---

[4] A *de minimis* dumping margin is defined as less than 2% *ad valorem*. *See* 19 U.S.C. § 1673b(b)(3).

14,906, 14,910 (Dep't Commerce Mar. 18, 2011) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190-92 (Fed. Cir. 1990)). Commerce explains that this approach excludes any inferences based on AFA (*i.e.*, a built in increase to deter non-compliance), and simply assumes that Kewei's lack of cooperation indicates that it did not deserve a 0% rate and would have been assigned antidumping duties higher than *de minimis*. The individual dumping margin assigned to Kewei would then be designated the separate rate and assigned to Jiangsu. Under this approach, therefore, the separate rate is not derived from AFA or *de minimis* rates. Commerce stated that "[p]ursuant to section 735(c)(5)(A) of the Act, when only one dumping margin for the individually investigated respondents is above *de minimis* and not based on AFA, the separate rate will be equal to that single above *de minimis* rate. Accordingly, if Kewei had chosen to cooperate, its above *de minimis* rate would have been assigned to [Jiangsu] as a separate rate in the *Final Determination*." *Remand Redetermination* at 8-9. Commerce contends that this approach constitutes a "reasonable method" of calculating a separate rate for Jiangsu.[5]

As far as an actual rate, Commerce has concluded that it is unnecessary to calculate a specific rate for Jiangsu because the entries covered by the separate rate have already been liquidated. Section 1673e(b)(2) provides that "[i]f the Commission, . . . finds threat of material injury, . . . then subject merchandise which is entered, . . . on or after the date of publication of notice of an affirmative determination of the Commission . . . shall be subject to the assessment of antidumping duties . . . , and the administering authority shall . . . refund any cash deposit made, to secure the payment of antidumping duties with respect to entries of the merchandise entered, . . . before that date. 19 U.S.C. § 1673e(b)(2).

---

[5] The net effect of assigning Jiangsu an above *de minimis* rate is that Jiangsu remains subject to the antidumping duty order covering 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China. A *de minimis* rate, on the other hand, would permit Jiangsu to be excluded from the order.

The ITC found a *threat* of material injury in the investigation and published its final determination on April 23, 2009. *See 1-Hydroxyethylidene-1,1-Diphosphonic Acid (HEDP) From China and India*, 74 Fed. Reg. 18,593 (ITC Apr. 23, 2009) (final results). Commerce, in turn, ordered Customs to collect cash deposits from Jiangsu (beginning on April 23, 2009) in an amount equal to the antidumping duty rates established in the investigation. *See 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from India and the People's Republic of China: Antidumping Duty Orders*, 74 Fed. Reg. 19,197 (Dep't Commerce Apr. 28, 2009). That rate was 36.21% (the separate rate), which remained in effect during this court proceeding, but changed when Commerce completed the first administrative review of the antidumping order on August 8, 2011. *See 1-Hydroxyethylidene-1, 1-Diphosphonic Acid From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Rescission in Part*, 76 Fed. Reg. 48,142 (Dep't Commerce Aug. 8, 2011). In the administrative review, Commerce selected Jiangsu as a *mandatory* respondent, concluded that it was not free from government control, and assigned Jiangsu the China-wide rate of 72.42%. The China-wide rate established in the first administrative review replaced the separate rate (cash deposit rate) assigned to Jiangsu in the investigation. Because Jiangsu did not appeal the rate that it was assigned in the first administrative review, there was no court ordered injunction suspending liquidation of its entries.

Commerce, therefore, ordered Customs to liquidate Jiangsu's entries made between April 23, 2009 (ITC's final determination) and March 31, 2010 (end of first review) at the rate established in the first administrative review. *See* Message from Michael B. Walsh, Director, AD/CVD & Revenue Policy & Programs, to Directors of Field Operations, Port Directors, Liquidation Instructions for 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the PRC Exported by the PRC-Wide Entity for the Period 04/23/2009 through 03/31/2010 (A-570-934)

(August 25, 2011), *available at* http://addcvd.cbp.gov/detail.asp?docID=1237303&qu= (last visited October 2, 2013).  Entries made prior to April 23, 2009 were not subject to antidumping duties. *See* 19 U.S.C. § 1673e(b)(2).  On remand, Commerce observed that the separate rate would not apply to Jiangsu's existing entries because they had already been liquidated.  Commerce therefore concluded that it would be a waste of administrative resources to calculate a specific rate for Jiangsu given that its entries would not benefit from an alternative rate.

Jiangsu, for its part, claims that Commerce's *Remand Redetermination* does not comply with the remand instructions provided by the Federal Circuit.  More specifically, Jiangsu argues that Commerce's "'assumption' that Kewei would not have received a rate of zero or *de minimis* is unsupported by the facts of record." Pl.'s Comments 2.  Jiangsu suggests that it is unreasonable to infer that Kewei failed to cooperate because it "knew" that it would receive an above *de minimis* rate. Pl.'s Comments 2.  Jiangsu also claims that there is sufficient data on the record to calculate a specific rate.  It argues Commerce's rationale for not calculating a specific rate is barred by *res judicata*. Pl.'s Comments 2-3.  The court disagrees.

Commerce has articulated an alternative approach (methodology) for calculating Jiangsu's separate rate.  In the investigation, Commerce took the simple average of the mandatory respondents' *de minimis* and AFA rates to derive a separate rate.  On remand, though, Commerce has abandoned the simple average methodology and has instead drawn an inference that Kewei would have been assigned a dumping margin greater than *de minimis* had it participated in the investigation; that individual rate would then be passed on to Jiangsu as the separate rate.  This alternative approach relies on drawing an inference about Kewei's actual dumping margin to derive a separate rate.

Drawing such an inference is reasonable because it is logical to assume that Kewei would have participated in the investigation if it could have proved that it deserved a 0% or *de minimis* dumping margin. The cases cited by Commerce, which mostly involve application of AFA, do provide support for the common sense inference that "a respondent can be assumed to make a rational decision to either respond or not respond to Commerce's questionnaires, based on which choice will result in the lower rate." *Tanjin Mach. Import & Export Corp. v. United States*, 35 CIT __, __, 752 F. Supp. 2d 1336, 1347 (2011). It is well understood that failing to cooperate in an antidumping investigation gives Commerce the discretion to draw certain inferences about the uncooperative respondent's pricing practices. *See id.* That is what Commerce did here. Commerce concluded that Kewei's failure to participate implied that it was dumping merchandise and would have been assigned an actual rate. This, though, is separate and distinct from an adverse inference in which Commerce selects a rate sufficiently adverse to deter non-compliance. *See, e.g.*, *De Cecco Di Filippo Fara S. Martino S.p.A v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). The separate rate calculation in this case would only reflect the individual rate assigned to Kewei. It would not reflect a built in increase to deter non-compliance. Applying Kewei's above *de minimis* rate to Jiangsu is contemplated in the statute and preferred over deriving a separate rate from only *de minimis* and AFA rates. *See* 19 U.S.C. § 1673d(c)(5).

Jiangsu, however, claims that Commerce's inference about Kewei's dumping margin is unreasonable given the record. Pl.'s Comments 2. For example, Jiangsu claims that Kewei likely misjudged its potential dumping margin because of the surrogate values used to calculate normal value in this case. Pl.'s Comments 5-8. The surrogate data yielded a normal value significantly less than the normal value in the petition. According to Jiangsu, Kewei likely would have

received a *de minimis* rate had it participated because normal value turned out to be [[          ]] of the normal value in the petition. Pl.'s Comments 6. Jiangsu cites data from the investigation indicating that the dumping margins in this case were much narrower than anticipated. Pl.'s Comments 3-4. Jiangsu suggests that this misjudgment about normal value at the beginning of the investigation contributed to Kewei's decision not to participate. Pl.'s Comments 6. Commerce reasonably rejected these arguments.

      To reach the conclusion suggested by Jiangsu, the court must draw several questionable inferences. First Jiangsu asks the court to draw its own inferences about Kewei's lack of participation and then, in addition, draw a second inference about Kewei's actual dumping margin from data of limited probative value. For example, Jiangsu claims that Kewei's AUV data combined with Wujin Water's normal value produces a negative margin, which demonstrates that Kewei would likely have been assigned a 0% dumping margin. The court, though, does not have much confidence that this data reflects Kewei's actual pricing practices. Kewei's AUV data is unverified and Wujin Water is a completely different company. The court cannot reasonably infer that Kewei would have been assigned a 0% dumping margin on the basis of this data. As a result, Jiangsu is not entitled to a 0% rate under this methodology. Similarly, Jiangsu also argues that "[t]he data of record supports the proposition that had the [separate rate] respondents submitted full responses, the [separate rate] respondents would have received a rate well below *de minimis*." Pl.'s Comments 7. Again, the court cannot reasonably infer that separate rate respondents would have all received 0% dumping margins on the basis of their unverified AUV data and Wujin Water's normal value. There is just not enough data to support that conclusion.

At the investigation stage of an antidumping proceeding Commerce relies on the participation of the mandatory respondents to establish the administrative record. It is black letter law that "the burden of creating an adequate record lies with [interested parties] and not with Commerce." *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (internal quotations and citation omitted). Where, as here, one mandatory respondent participates (and receives a *de minimis* rate) and the other fails to participate (and receives a rate based on AFA), Commerce is left with very little pricing data to calculate a separate rate. In those situations Commerce essentially has one substantiated dumping margin (*de minimis*) and the remainder is Q&V data. That is what happened here and, more recently, in *Bestpak*. See *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378-79 (Fed. Cir. 2013). Part of the problem may be due to Commerce's selection of only two mandatory respondents under 19 U.S.C. § 1677f-1(c)(2). See *Bestpak*, 716 F.3d at 1379 ("Even the Court of International Trade noted that 'Commerce put itself in a precarious situation when it selected only two mandatory respondents.'") (quoting *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 35 CIT __, __, 783 F.Supp.2d 1343, 1351 n.4 (2011). Jiangsu never raised that issue in this proceeding.

Although it is unfortunate that Jiangsu and other separate rate respondents face negative consequences as a result of Commerce's choice, this situation does not support the claim of respondents, such as Jiangsu, that they are entitled to a 0% dumping margin on the basis of unverified Q&V data and non-company specific normal values. Here, the court cannot reject Commerce's chosen approach for calculating Jiangsu's separate rate, which is based on a common sense inference about the pricing practices of uncooperative respondents, in favor of Jiangsu's approach, which requires the court to draw favorable, though questionable, inferences

about its pricing practices from limited data. The Federal Circuit concluded that it was arbitrary for Commerce to calculate a hypothetical AFA rate (with a built in increase to deter non-compliance) solely for the purpose of calculating and assigning a separate rate to Jiangsu (a cooperative separate rate respondent). Commerce has addressed that issue and articulated an alternative approach to calculating a separate rate that does not involve AFA. Commerce's new approach assumes that Kewei would have been assigned a dumping margin above *de minimis* had it participated in the investigation. That rate would also serve as the separate rate. This is a reasonable approach given the limitations of the record.

Another alternative would have been for Commerce to calculate a specific rate for Jiangsu but Commerce has provided a legitimate explanation for not undertaking that process. None of Jiangsu's entries can benefit from the separate rate in this case. Those entries have already been liquidated at the rate established in the first administrative review. In the *Remand Redetermination*, Commerce suggests that it might have been forced to collect and verify additional information to calculate a specific rate for Jiangsu, and that doing so would be a waste of administrative resources given that the separate rate will not apply to the subject entries. *See id.* at 11. The court agrees. Considering that the entries have already been liquidated, calculating a specific rate for Jiangsu is not necessary. Jiangsu claims that Commerce should have raised this issue earlier and cannot skip the actual calculation because doing so is barred by *res judicata*. "For a prior judgment to bind a party as *res judicata*, however, the judgment must have been a final one." *See Koyo Seiko Co., Ltd. v. United States*, 95 F.3d 1094, 1097 (Fed. Cir. 1996). The Federal Circuit's decision was not a final judgment but rather a decision remanding the case to Commerce to reconsider its approach in calculating Jiangsu's separate rate. *See Changzhou*, 701 F.3d at 1379. After establishing an alternative approach, Commerce reasonably

concluded that it was unnecessary to calculate a specific rate for Jiangsu because the subject entries had already been liquidated.  The court is persuaded that the doctrine of *res judicata* does not apply here.

Jiangsu, moreover, has not articulated why Commerce must calculate a specific rate other than general references to the Federal Circuit's remand instructions.  In the court's view, the Federal Circuit's remand instructions ordered Commerce to consider a different *approach* for calculating a separate rate, which Commerce did.  The instructions, however, did not order Commerce to calculate a specific rate.  There is no good reason to issue another remand ordering Commerce to calculate a specific rate when Jiangsu's entries have already been liquidated.  Although it is possible that a specific rate might serve some purpose in a future review, an argument raised by Jiangsu on remand, *see Remand Redetermination* at 22, Jiangsu did not raise that argument in its comments before this court.  The court will therefore treat the issue as waived.  Accordingly, Commerce's chosen methodology for calculating Jiangsu's separate rate is a reasonable choice (*i.e.*, not arbitrary) given the limited options presented by the record.

### III. CONCLUSION

For the foregoing reasons, Commerce's *Remand Redetermination* is sustained.  Judgment will be entered accordingly.


Dated:  October 2, 2013                                                              /s/ Judith M. Barzilay
         New York, NY                                                           Judith M. Barzilay, Senior Judge